# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-KA-00159-COA

COREY PITTMAN A/K/A COREY PITMAN          APPELLANT
A/K/A CORIEY PITTMAN A/K/A COREY
DEONTE PITTMAN

v.

STATE OF MISSISSIPPI                                      APPELLEE

DATE OF JUDGMENT:               02/20/2020
TRIAL JUDGE:                         DEBRA W. BLACKWELL
COURT FROM WHICH APPEALED:    AMITE COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:        OFFICE OF STATE PUBLIC DEFENDER
                                     BY: GEORGE T. HOLMES
ATTORNEY FOR APPELLEE:         OFFICE OF THE ATTORNEY GENERAL
                                     BY: LAUREN GABRIELLE CANTRELL
DISTRICT ATTORNEY:               RONNIE LEE HARPER
NATURE OF THE CASE:             CRIMINAL - FELONY
DISPOSITION:                       AFFIRMED - 04/06/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE WILSON, P.J., LAWRENCE AND McCARTY, JJ.

### McCARTY, J., FOR THE COURT:

¶1.     A defendant was convicted of armed robbery and conspiracy after he coached a fourteen-year-old boy to rob a store. A trial court sentenced him to twenty-five years in custody, with ten years to serve and fifteen years suspended, and placed him on post-release supervision for the armed robbery charge. He was also ordered to serve a concurrent five-year sentence for the conspiracy charge.

¶2.     The defendant appeals, arguing his verdict was contrary to the overwhelming weight of the evidence. Finding no error, we affirm.

## FACTS

¶3.     At the age of fourteen, Davian Grady was befriended by a twenty-three-year-old man named Corey Pittman, who lived "up the road" from him.  According to Grady, they sometimes talked on the phone.  While Grady did not know how to drive or have a driver's license or car, Pittman had a commercial driver's license and had occasionally worked driving 18 wheelers.

¶4.     One Friday afternoon in 2018, Grady and Pittman went to a basketball game in McComb.  At some point they left the game and headed for Liberty, a city about thirty minutes away.  In Grady's recollection, they rode in a white dually pick-up that belonged to Pittman.  On the way there, Grady noticed that Pittman was eyeing an Exxon gas station.  As Pittman examined the station, he told Grady that he was "thinking about hitting [the] store," but a security truck was parked in front of it.  The teenager knew that "hitting" a store meant "robbing" it.

¶5.     At some point, Pittman turned his car around and headed down a road that led to a Dollar General.  He parked his truck at a wooded area that was in walking distance from the store.  According to Grady, Pittman told him that they could "hit" Dollar General.  When Grady replied, "I don't know about that," Pittman assured him that "the system" could not send him to jail since he was only fourteen years old.

¶6.     Grady continued to express his concern about the risky nature of the crime.  Eventually, the back-and-forth between the two lead Pittman to warn Grady that he would "get him" if Grady ever "[told] on [him]."  After deliberating, Grady finally agreed to rob the

store; he claimed he was afraid and did not want to be abandoned by Pittman in a strange city.

¶7.    Pittman then coached Grady on how he should handle the robbery. He gave the teenager a pair of gloves, a mask, dark sunshades, and a semi-automatic SKS assault rifle to complete the job. According to Grady, Pittman told him that he would meet the teen at the same wooded area when the robbery was completed.

¶8.    With the rifle in hand, Grady walked from behind the Dollar General store to the front. He encountered an employee and her fiancé outside the store. Grady pointed the rifle at them, forced them inside the building, and commanded them to lie face-down on the floor. Meanwhile, Grady robbed another clerk at gunpoint. After he completed the crime, he escaped carrying a bag packed with $1,000 worth of dollar bills and rolled up change, and he fled to the rendezvous point. However, Pittman was not there as he had promised.

¶9.    After hiding and waiting in the bushes for about two hours, Grady abandoned the bag of money and other articles Pittman had given him and ran to a nearby house in hopes of using a phone. When he knocked on the door, a man appeared and brandished a gun at him, scaring him away. Grady then ran through a pathway that led to a Subway restaurant, told the employees he needed to call his "brother," and dialed Pittman's number. Pittman answered and hung up when Grady told him to pick him up at the Subway.

¶10.    Pittman picked Grady up but abandoned him on the side of the road when he saw police lights. As Grady walked alone on the road, an officer searching the area noticed that the teenager fit the description of a young boy who had just robbed Dollar General. As a

result, the officer promptly arrested Grady.

¶11.    Grady eventually admitted to his involvement in the robbery and told an investigating officer that Pittman encouraged him to rob the store. Pittman was later arrested as a result.

¶12.    Pittman was charged with armed robbery and conspiracy. At his trial, Grady testified to the above narrative. An investigating officer who also testified further confirmed Grady's testimony by stating that there was a basketball game scheduled on the night of the robbery. The officer then explained that while responding to a call about the Dollar General robbery, and upon securing the surrounding area, he received information from a nearby resident that a young black had male knocked on his door asking to use his phone. Just as Grady testified, the officer confirmed that the resident told police he pointed a gun at the teen and scared him away. The officer also testified that around that time, he received information that a ski mask, gloves, semi-automatic assault rifle, sunglasses, and bag of money had been abandoned in the same wooded area in which Grady said he left them. Most importantly, the officer stated that he was able to confirm through Subway's phone records that Grady had indeed called Pittman from the restaurant's phone on the night of the robbery.

¶13.    Pittman flatly denied any involvement in the robbery. He testified that he did not know how Grady had gotten his number, while admitting the teenager would sometimes call him while he was on the road driving trucks. He claimed he only saw Grady around the neighborhood occasionally and that he would encourage the teen to "stay out of trouble." Pittman further insisted that he did not own a white pickup truck, as Grady had testified. His mother and brother corroborated his testimony, stating that Pittman did not own a white

4

truck. They further claimed that Pittman was at home on the night of the robbery and challenged the fact that Grady told the employees at the Subway restaurant that he needed to call his "brother," although he and Pittman were not related.

¶14. At the close of evidence, and following deliberations, the jury found Pittman guilty of armed robbery and conspiracy. Aggrieved, Pittman appeals.

## STANDARD OF REVIEW

¶15. When determining whether a jury verdict is against the overwhelming weight of the evidence, "this Court must accept the evidence which supports the verdict as the truth and will reverse only if convinced that the trial court abused its discretion in not granting a new trial." *Bradley v. State*, 921 So. 2d 385, 389 (¶12) (Miss. Ct. App. 2005). Therefore, we will not order a new trial unless "the verdict is so contrary to the overwhelming weight of the evidence that to allow the verdict to stand would be to sanction an unconscionable injustice." *Id*. Our review is limited in this manner because "factual disputes are properly resolved by the jury[,] not by an appeals court." *Id*.

## ANALYSIS

¶16. Pittman claims the jury's verdict was against the overwhelming weight of the evidence because his convictions "depend[ed] entirely on the testimony of his co-defendant," which he believes was "unreasonable, self-contradictory, and substantially impeached."

### A. Conspiracy

¶17. "To establish conspiracy to commit armed robbery, the State must prove beyond a reasonable doubt [that the defendant] agreed with one or more persons to commit an armed

5

robbery." *Thomas v. State*, 180 So. 3d 756, 762 (¶19) (Miss. Ct. App. 2015) (citing Miss. Code Ann. § 97-1-1(1) (Rev. 2014) (defining conspiracy as "two (2) or more persons conspir[ing] either: (a) [t]o commit a crime; or . . . (h) [t]o accomplish any unlawful purpose, or a lawful purpose by any unlawful means")). In Mississippi, "no overt act need be proven in furtherance of the conspiracy." *Id*. (cleaned up). "Once the existence of a conspiracy is shown, only slight evidence is required to connect a particular defendant with the conspiracy." *Id*. Circumstantial evidence alone is sufficient to prove the existence of a conspiracy. *Id*.

¶18.    Furthermore, "the uncorroborated testimony of an accomplice may be sufficient to convict an accused" as long as the accomplice's testimony is not "unreasonable, self contradictory or substantially impeached." *Osborne v. State*, 54 So. 3d 841, 846 (¶22) (Miss. 2011) (cleaned up). "Only slight corroboration of an accomplice's testimony is required to sustain a conviction." *Id*. "The testimony that *must* be corroborated is the part connecting the defendant to the crime." *Id*. (emphasis added).

¶19.    In accordance with this precedent, we find there was enough evidence to tie Pittman to the crime of conspiracy. Grady testified that he "caught a ride" with Pittman to go to a basketball game. The officer who testified at Pittman's trial confirmed that there was a basketball game scheduled on the night Grady robbed Dollar General. Because evidence established that Grady had no car, no license, and did not know how to drive, it was reasonable for the jury to believe that he was only able to travel from his hometown in McComb to Liberty with the help of another person. Unlike Grady, Pittman did have a

6

license and available transportation.

¶20. Furthermore, Grady testified that prior to robbing the store, he and Pittman planned to meet at a wooded area not far from Dollar General after he finished the job. After he robbed the store, Grady ran to that wooded area and waited on Pittman for several hours before finally abandoning the bag of money, ski mask, gloves, sunglasses, and rifle. An officer testified that he found those same items in that wooded area on the night of the robbery.

¶21. Grady also testified that after abandoning those items he ran to a nearby house and was scared away by a man brandishing a gun at him. An officer confirmed this at trial by testifying that a resident at that same house called police to report that a young boy fitting Grady's description had knocked on his door asking to use his telephone but ran away once the man pointed a gun at him.

¶22. Finally, Grady testified that he fled to a nearby Subway to call Pittman from the establishment's phone. The most damaging piece of corroborating evidence was the phone records that confirmed Grady had indeed called Pittman from the restaurant. Furthermore, evidence establishes that Pittman picked Grady up from Subway.

¶23. We find that this consistent testimony, coupled with the phone records, were sufficient for a jury to find that Pittman conspired with Grady to commit armed robbery. Even if only Grady had testified, the conviction could still be affirmed. *Osborne*, 54 So. 3d at 846 (¶22). Yet there was more than just his testimony, as the part of the accomplice's testimony "connecting [Pittman] to the crime"—that Grady called Pittman to pick him up after the

7

robbery—was corroborated by phone records. *Id.* According to *Osborne*, these facts warrant affirming the conviction.

¶24. Pittman argues that Grady's testimony was substantially impeached and inconsistent because he, his mother, and his brother each testified he did not own a white truck as Grady claimed. Pittman further pointed out that Grady told police that he called his "brother" at Subway, although he and Pittman are not related. Finally, Pittman claims "it [was] unreasonable that [he] would have driven away from the rendezvous point."

¶25. When impeachment is at issue, "[i]t is the jury's responsibility to evaluate the credibility of a witness." *Green v. State*, 25 So. 3d 1086, 1089 (¶12) (Miss. Ct. App. 2010). "The jury has the duty to determine the impeachment value of inconsistencies or contradictions as well as testimonial defects of perception, memory, and sincerity." *Id.*

¶26. As to Pittman's claims that the teenager's testimony was not reliable, Grady explained at trial that he only referred to Pittman as his brother because he thought the lie would ease the employees' reluctance to provide their phone. Additionally, there are several plausible reasons why Pittman would have driven away from the "rendezvous point," such as fear of being caught (which is further supported by the fact that Pittman actually abandoned Grady once he saw police lights). Finally, whether Pittman actually owned a white truck does not impact whether Pittman committed the crimes with which he was charged. It was within the province of the jury to decide whether he committed the crimes. Therefore, Grady's testimony was not so "unreasonable, self contradictory or substantially impeached" to warrant reversal. *Osborne*, 54 So. 3d at 846 (¶22).

*B.     Armed robbery*

¶27.    It was uncontested that Grady robbed Dollar General.  As previously shown, the evidence also shows that Pittman conspired with Grady to rob Dollar General.  "[A]n accessory to armed robbery is just as guilty as the principal." *Diggs v. State*, 46 So. 3d 361, 367 (¶20) (Miss. Ct. App. 2010).  Therefore, Pittman's armed robbery conviction is sustained.

## CONCLUSION

¶28.    Because the verdict was not so "contrary to the overwhelming weight of the evidence that to allow the verdict to stand would be to sanction an unconscionable injustice," we find Pittman is not entitled to a new trial. *Bradley*, 921 So. 2d at 389 (¶12).  His convictions are therefore affirmed.

¶29.    **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR.  CARLTON, P.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**